**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEBRA L. WARNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 C 02782 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| UNUM LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Debra Warner brought this ERISA benefits action to compel Defendant Unum to pay her long-term disability and life insurance benefits that she contends she is owed under her former employer's group plan. The parties have filed cross-motions for summary judgment. For the reasons that follow, the Court grants Warner's motion and denies Unum's motion.

## FACTS

The following material and undisputed facts are taken from the parties' Local Rule 56.1 Statements and Responses. Further details from the medical evidence will be introduced as needed to analyze the parties' arguments.

Plaintiff worked as a Nurse Manager for Tyson Foods, Inc. ("Tyson") until she ceased working in January 2011 based on what she describes as the cumulative impact of fibromyalgia, osteoarthritis, chronic low back pain, and other maladies. Warner sought benefits under Tyson's Long Term Disability Insurance Plan (the "Plan"), an employee benefit welfare plan that is established pursuant to a Group Long Term Disability Insurance Policy ("Group Policy") issued by Unum and governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA"). Unum is the Plan's insurer and claims administrator.

The Plan provides disability insurance. For the first 24 months, a claimant is "disabled" when Unum determines that she is "limited from performing the material and substantial duties of [her] regular occupation[1] due to [her] sickness or injury" and she has "a 20% or more loss in [her] indexed monthly earnings due to the same sickness or injury." Before any disability benefits are payable, the claimant must satisfy a 90-day "Elimination Period" of continuous disability. After 24 months, a claimant is "disabled" under the Plan "when Unum determines that due to the same sickness or injury, [she is] unable to perform the duties of any gainful occupation for which [she is] reasonably fitted by education, training, or experience."

As to life insurance coverage, the Plan provides: "If you become totally disabled while covered under this plan, your life insurance coverage will continue, with payment from your Employer, for as long as you remain totally disabled. Totally disabled means you are unable to perform any work for compensation or profit as a result of an injury or sickness. You must provide proof of disability acceptable to Unum."

When Warner ceased working in January 2011, she prepared a "Claimant's Statement" for Tyson. She described her claimed disability as follows: "Severe weakness, unable to sit or stand for greater than 30 minutes, started [1/17/11]. Severe fatigue, joint pain, difficulty sleeping, blurred vision, headache, unable to concentrate, dizziness, unstable when walking, memory difficulty, increased back pain, fevers." This Statement was accompanied by a partially incomplete Attending Physician Statement from Warner's family physician, Dr. Kevin Jeffries, who listed Warner's "primary diagnosis" as lupus and included a list of symptoms similar to Warner's list. Jeffries wrote that Warner's treatment was to follow up with a rheumatologist and

---

[1] "Regular occupation" is the one the claimant is "routinely performing" when the disability begins, as determined by how the occupation is "normally performed in the national economy, instead of how the work tasks are performed for a specific employer."

that she should stop working effective January 19, 2011. Warner submitted a supplemental Attending Physician Statement to Unum on June 14, 2011, in which Dr. Jeffries assessed Warner's abilities as of March 2011. He indicated that she could "sit, stand, or walk" for zero hours per workday and could never "climb, twist/bend/stoop, reach above shoulder level, operate heavy machinery, perform fine finger movement, perform hand-eye coordinated movements, perform pushing/pulling, or lift/ carry" any amount of weight. He listed her necessary work restrictions as "no work" and stated that her expected return-to-work dates was "? 4-6 weeks."

Warner told Unum's disability specialist on May 31, 2011, that she had been unable to get better after a viral infection in mid-January. When asked about Dr. Jeffries' lupus diagnosis, she said that "the doctors do not agree," and that her doctors "do not know what is wrong" and "do not think it is serious." She reported that she had been referred to rheumatologist Dr. Couri and infectious disease specialist Dr. Baig. Warner stated that she could not perform any of her job duties—which entailed managing seven to eight nurses and being in charge of safety, ergonomics, and OSHA reporting for a facility of 75 workers —"because of the fatigue."

Unum sent questions and a request for a completed Estimated Functional Abilities Form to Dr. Jeffries on June 13, 2011; it was returned on July 8, 2011 by a Dr. Sureka instead. Dr. Jeffries had referred Warner to Sureka, a physiatrist, for a physical evaluation and completion of the form. The assessed restrictions and limitations were to "avoid lifting objects heavier than 10 pounds" and "avoid frequent bending, stoopping, climbing stairs." He estimated it was "fair" to believe Warner could return to full-time work in six months. Sureka assessed Warner's abilities in a number of areas, concluding that she "occasionally" had at least a limited capacity to lift weights up to 10 pounds; to bend, kneel, crawl, climb stairs, reach above shoulder-height, and

push or pull 10 pounds; and could use her right, but not her left, hand and foot for certain movements.

When contacted by Unum's consulting physician, Dr. Sureka stated that the scope of his referral was limited to an opinion on her functional capacity and that he deferred to Dr. Jeffries as to any testing or treatment for Warner's symptoms. He opined that she was unable to work because of her level of pain but that she "might well" regain the ability to work within six months. Unum was not able to speak directly with Dr. Jeffries; he was on vacation and did not return before Unum completed its file review. It obtained Warner's medical records from Dr. Jeffries, Dr. Couri, Dr. Baig and another infectious disease specialist, Dr. Brobbey.

Warner traces her health problems back to the early 1990s, when she first developed a low-grade fever, joint pain, and fatigue. Lyme disease and parvovirus were ruled out, and eventually Warner was diagnosed with fibromyalgia and chronic fatigue syndrome.[2] Warner also has a history of neurological issues, including migraine, complex partial seizures, and a benign cyst in her brain. Warner traces her history of back pain to 2005, when she injured her back lifting a patient. After a surgery in January 2009, she improved, although she reinjured her back in December of that year attempting to lift a heavy suitcase. Since that time, she has taken narcotic pain medications for persistent pain. Dr. Jeffries' records reveal a long history of treatment for pain, including back pain and migraines, after the surgery. The treatment consisted

---

[2] Fibromyalgia is "a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003).

primarily of various prescription drugs for symptoms including pain, insomnia, and anxiety. Warner has also done several courses of physical therapy since the surgery.

Warner's long-term disability claim, which was submitted on May 10, 2011, alleges the onset of disability in January 2011. On January 18, 2011, and January 27, 2011, Warner saw Dr. Jeffries for flu symptoms and then acute bronchitis; Warner was advised to stay off of work January 26 to 28. At that time, Warner also saw Dr. Couri, her rheumatologist, who noted she was back for the first time in "4 or 5 years" for increased pain in her back, hands, elbows, and shoulders. After his examination, Dr. Couri diagnosed fibromyalgia "with increased symptoms again," and osteoarthritis in her spine, hands, and petellofemoral joints, and advised her stay off work for six days. Warner returned to Dr. Jeffries for further treatment for the flu symptoms, and then again on February 11, for fatigue, being "tired all the time," being unable to sleep, and for dizziness, cough, body aches, joint pain, and total lack of energy. On February 23, 2011, Warner saw Dr. Brobbey, an infectious disease specialist, for fever; he noted her "intermittent" symptoms of cough, fatigue, and headache, as well as "night sweats and pain in joints (for 2 decades)." Dr. Brobbey noted Warner's diagnoses of fibromyalgia, chronic fatigue, and hypothyroidism, and he suggested that her symptoms might be attributable to influenza or to an aggravation of her chronic fatigue syndrome. Dr. Brobbey reviewed old lab tests and determined that Warner did not have Lyme disease, but he ordered further tests to rule out lupus; those tests were negative. He further ordered tests for inflammatory bowel syndrome and Hepatitis B, which also were negative. Dr. Brobbey also performed a musculoskeletal exam, noting Warner's joint pain but finding no deformities or abnormalities.

On March 1, 2011, Warner visited Dr. Jeffries for the purpose of filling out short-term disability paperwork; there was no physical exam on that date, although Dr. Jeffries had

examined Warner at least four times in the preceding two months. On March 10, Warner saw Dr. Baig, the other infectious disease specialist, complaining of "fever," although she did not register a fever at the time of the appointment, and for chronic pain in the small joints of her hands and wrists. No musculoskeletal evaluation was recorded. At a March 31 follow-up appointment, again no fever was recorded, although Warner continued to report still having "a low grade temp" at night.

On April 19, 2011, Warner saw Dr. Jeffries for "back / flank pain," and he noted that Warner had passed some kidney stones. Dr. Jeffries noted that Warner continued to complain of night sweats, headaches, and joint pain. He diagnosed "questionable" infectious disease and auto immune disorder, as well as actual urinary tract infection / flank pain, chronic headaches / migraines, and depression. In his review of symptoms, he noted "questionable" fever, as well as fatigue, gastrointestinal pain, myalgia, back pain, joint stiffness, depression, anxiety and insomnia. On the same day, Warner had another appointment with Dr. Baig, who noted that Warner's fever had reportedly improved. His report notes diagnoses of "Fever, Unspecified" and "Chronic Fatigue," and he further noted "fibromyalgia and mood disorder possible." He noted Warner's continued complaint of joint pain.

On April 28, 2011, Warner was examined by Dr. Couri, who noted her consultations with the infectious disease specialists and stated, "I told her that I had been following her for over 10 years and she has never had anything to suggest lupus." He believed her "main diagnosis" was fibromyalgia, and he noted the viral infection that "started this current flare up." He documented tenderness in Warner's neck, back, gluteus, and tochanters, and gave her injections for pain relief.

On May 20, 2011—the first medical appointment after Warner's long-term disability claim was submitted on May 10—Warner was examined by Dr. Jeffries for her complaints of, among other things, fever, neck pain, and back pain," which had recently increased. Dr. Jeffries noted that Warner suffers from chronic fatigue/ pain syndrome, irritable bowel syndrome, chronic migraines, chronic back pain, and panic attacks. Dr. Jeffries continued to administer and adjust the doses of the narcotic pain medication including OxyContin and Vicodin. Attached to the treatment record is Warner's own documentation of her symptoms, drafted in January 2011, which lists and describes 27 symptoms.

On June 20, 2011, Warner was diagnosed with acute appendicitis and had a laparoscopic appendectomy and hernia repair. The surgery was successful.

On July 8, 2011, Warner was examined by Dr. Sureka "for purposes of disability determination." Warner had been referred by Dr. Jeffries, whom Unum had contacted with a request to complete an assessment of Warner's functional capacity. Dr. Sureka noted an "impression" of degenerative arthritis in the left shoulder, both wrists, right knee, both ankles, and lumbar spine; a history of fatigue, sleep difficulty, nausea and vomiting, and fever. He opined that Warner "is not able to work as a nurse at present and she should stay off work for about six months." Dr. Sureka's record also notes Warner's complaints of upper and lower back pain radiating to her foot, left shoulder pain radiating to her left hand, and seizures. As to her functional limitations, Dr. Sureka reported that Warner was limited to only occasional lifting of up to 10 lbs. and occasional bending, kneeling, crawling, climbing stairs, reaching above the shoulders, and pushing/pulling of ten pounds. In addition, Dr. Sureka determined that Warner had limited use of her left hand and foot. He further opined that Warner was capable of sedentary

activity for only two hours out of an eight-hour day, and concluded that she should be absent from work for six months due to her disability.

As part of its review of the claim, Unum had its own doctors and consultants review Warner's medical history; none examined Warner personally. A vocational consultant, Marian Pearman, analyzed Warner's regular occupation as a "Nurse Supervisor Occupational Health Nursing." In her vocational report, Pearman reported that this is a "light" strength job, which can require "Lifting, Carrying, Pushing, Pulling 20 Lbs. occasionally [up to 1/3 of the time], frequently [1/3 to 2/3 of the time] up to 10 Lbs., or negligible amount constantly [over 2/3 of the time]. Can include walking and or standing frequently even though weight is negligible. Can include pushing and or pulling of arm and or leg controls."

Dr. James Folkening, a Unum consulting physician, prepared a report dated July 26, 2011. He analyzed the medical records and claim documents, and ultimately opined as follows:

> Pain intensity reported by the claimant is somewhat out of proportion to the limited abnormal physical findings documented. With the exception of lumbar spinal imaging performed in January 2010, there is no record of skeletal imaging studies of any kind to evaluate tender or painful bones or joints. Degenerative changes of the claimant's sacroiliac joints were noted on the lumbar spine x-ray exam of 01/04/10, but no examiner has commented that the claimant's apparent degree of degenerative joint disease is obviously advanced for her age. The claimant is on a conservative medication program to manage her discomfort. There is no indication that she is receiving physical therapy or participating in a home exercise program at this time. The medical record does not report the claimant requiring an assistive device for weight-bearing activity. There is no history of falls or unstable gait. Strength and sensation of all extremities is consistently reported to be normal. There is no compelling evidence in the medical records submitted for review that the claimant is exhibiting impairment from musculoskeletal symptoms that should preclude performance of her customary full-time occupational activities as described.

Dr. Folkening, an internist with no specialized expertise in rheumatology, orthopedics, or occupational medicine, never examined Warner, nor did any Unum consulting doctor.

Warner's records were also analyzed by consultant Dr. Susan Council, a physiatrist, who prepared a report dated July 27, 2011. She opined:

> Ms. Warner has had lumbar surgery in the past and appeared to do initially fairly well. Neurological examinations have remained normal. Rheumatological work up was largely negative. Radiographic studies are non-revealing in regard to source of pain. She did note improvement with physical therapy earlier. She reported that she had a history of chronic fatigue syndrome (along with various non-proven disorders- Lyme disease, seizure disorder, Lupus) to her providers and was diagnosed with fibromyalgia as well. Though fibromyalgia and chronic fatigue syndrome are frequently seen concurrently, treatment is geared towards a good stretching and exercise program with return to all vocational and avocational activities. I agree with Dr. Folkening that with a reasonable degree of medical certainty, … Ms. Warner can return to activities with the ability to perform frequent standing and walking, occasional reaching, handling, fingering, and feeling, the occasional exertion of up to 20 pounds of force, and the more frequent exertion of up to 10 pounds of force with the upper extremities combined to lift, carry, or move objects on a full time basis. Her attending physician's restrictions appear to be based on her complaints of pain[.] In regards to a whole person analysis, other medical issues…are not causing issues that would prevent activity level noted above, even when combined.

Unum rejected Warner's claim, determining that she failed to satisfy the terms and conditions of the payment of disability benefits under the Plan and failed to satisfy the terms and conditions for waiver of life insurance premiums under Tyson's Group Life Insurance Policy. The denial letters were sent on July 29, 2011, and August 2, 2011, respectively. Warner timely appealed these determinations.

With her appeal, Warner submitted a Work Well Systems, Inc., Functional Capacity Evaluation dated December 1, 2011, performed by physical therapist Dan Bryan, to whom Warner was referred by Dr. Jeffries. Warner had previously been treated by Mr. Bryan over the

course of approximately a dozen physical therapy sessions. The FCE involved a battery of tests to determine the extent of Warner's physical limitations in areas such as strength, range of motion, sitting, standing, walking, kneeling, crouching, lifting, and carrying. Bryan reported that Warner "demonstrated cooperative behavior and was willing to work to maximum abilities in all test items," except where lower back pain prevented her from maximum exertion. As to such occasions, the report noted that Warner's reports of pain during the exam were supported by objective indicia of pain. On the Spinal Function Sort portion of the FCE, which "compares the job applicant's current abilities to job demands, and sets a baseline of abilities" to perform work tasks involving the spine and lower extremities, pegged Warner's Rating of Perceived Capacity (RPC) at 107, which correlates to an ability to perform "sedentary" jobs under the Labor Department's Physical Demand Characteristic of Work (PDC) system. Warner's "regular occupation" was categorized by Unum's vocational consultant as "light," which is more strenuous than "sedentary." The FCE concluded that the observed functional limitations "are consistent with physical impairments and diagnosis" and recommended "job modifications or alternative placement" in the event that Warner returned to work.

Warner also submitted the results of a "recheck evaluation" by Dr. Sureka. After summarizing her history, reported symptoms, and his examination, Dr. Sureka opined: "It appears that Mrs. Debra Warner is not able to work as a nurse at this time and she should stay off work until further notice."

Warner also submitted numerous other additional treatment records from the intervening time period. These include an August 9, 2011, examination by Dr. Jeffries in which he diagnosed arthralgia, myalgia, neck pain, back pain, joint stiffness, depression, and anxiety among her afflictions. The following month, Dr. Jeffries listed Warner's diagnoses as fibromyalgia, urinary

tract infection, insomnia, and chronic back pain. The next month, Warner reported to Dr. Jeffries that she thought she had a seizure while driving. On November 16, 2011, Dr. Couri examined Warner and noted her reports of increased pain in her back after her physical therapist had pushed on her lower back with his elbow. "The pain has spread to the rest of her back and her neck. She is more frustrated again. … She is tender at her neck, back, gluteus and trochanters." Dr. Couri noted that Warner was currently taking Actiq for headaches, a Duragesic patch, Vicodin, Topamax, Trazodone, and Xanax. With her appeal, Warner also submitted letters from her husband and her daughter describing her condition, and her own handwritten journal entries from October 1, 2011, to November 5, 2011.

For purposes of the appeal, Unum consulted Dr. Laina Rodela, who evaluated the entire file, including the newly submitted record and FCE, and prepared a report. Dr. Rodela's review concludes:

> It is my opinion, with a reasonable degree of medical certainty, there are no [restrictions and limitations] which preclude her from consistently performing at levels prior to filing for disability. This is based on the following:
> - Multiple somatic complaints are evaluated by rheumatology, [infectious disease] and neurology with no finding other than fibromyalgia.
> - Fibromyalgia is not a progressive disease of the nerves or muscles and increased, rather than decreased, activity is the cornerstone of treatment. The level of severity she describes is in excess of fibromyalgia symptoms and no [restrictions and limitations] are supported.
> - With the exception of Dr. Sureka's exams, rheumatology, neurology and [infectious disease] find no abnormalities. Specifically, muscle strength, [range of motion], reflexes and sensation are intact.
> - Dr. Sureka's exams do not correlate to any pathophysiological etiology and there is no synovitis, effusion or joint abnormalities.
> - Despite her complaint of back pain and multiple sites of joint pain, no imaging is pursued and no orthopedic evaluation is obtained.

- Pain medications remain stable prior to and after the time she leaves work.

In summary, there are no exams, laboratory testing, specialty evaluation, medication changes or imaging to support the level of impairment she describes.

By letter dated March 5, 2012, Unum notified Warner that it was upholding its decision to deny benefits. Unum stated: "[T]he FCE findings were noted and evaluated during the medical review process. Based on our review findings, there are no exams, laboratory testing, specialty evaluation, medication changes or imaging to support the level of impairment Ms. Warner describes and the decisions to deny benefits on her claims are appropriate." Unum later informed Warner that the decision to deny her claim for Life Insurance Premium Continuation was also upheld. Unum informed Warner of her right to bring a civil suit under ERISA.

Warner indeed filed suit. Her First Amended Complaint, filed November 4, 2013, alleges that she has been continuously unable to return to work since February 4, 2011, and has thus met and continues to meet the LTD and LWOP Policy definitions of disability since that date. In her complaint she attributes her disability to "the debilitating effects of fibromyalgia, chronic fatigue syndrome, chronic back pain, seizure disorder, and other impairments"; her summary judgment motion refers to her disability as the "cumulative impact" of "fibromyalgia, osteoarthritis, chronic low back pain, and other maladies." She seeks life insurance benefits under a waiver of premium on account of her disability, as well as LTD benefits due since May 5, 2011, in the amount of $3,960.00 per month (which is 60% of Plaintiff's pre-disability monthly salary of $6,660.00).

## DISCUSSION

The parties agree that the Plan grants Unum discretionary authority to make benefit determinations, which means that this Court reviews the denial of benefits under the deferential

arbitrary and capricious standard. *Cerentano v. UMWA Health and Retirement Funds*, 735 F.3d 976, 981 (7th Cir. 2013). Under that standard, the Plan administrator's determination will be upheld "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Id*. (quoting *Tompkins v. Cent. Laborers' Pension Fund*, 712 F.3d 995, 999 (7th Cir. 2013). However, "[r]eview under this deferential standard is not a rubber stamp," and courts should not uphold a determination where there is an absence of reasoning in the record to support it" *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 128 S. Ct. 2343, 2346; (2008); *Holmstrom v. Metro. Life Ins. Co*., 615 F.3d 758, 766 (7th Cir. 2010). In evaluating whether the administrator's decision was arbitrary and capricious, the Court may consider, among other factors, the administrator's structural conflict of interest as both the evaluator and payor of claims and the process afforded the parties. *Weitzenkamp v. Unum Life Ins. Co. of Am.*, 661 F.3d 323, 329 (7th Cir. 2011); *see Glenn*, 554 U.S. at 108.

First, Warner argues that Unum arbitrarily refused to credit her treating physicians in favor of its own non-examining in-house doctors. Warner further contends that her subjective complaints of pain were improperly discredited. Finally, Warner argues that Unum's structural conflict of interest and its alleged history of biased decision-making support of reversal of its decision. For its part, Unum contends that it reasonably relied upon the opinions of medical experts and Warner's own treating physicians in denying the claims, and that these questions of medical judgment are within the discretion of the administrator.

## A. Did Unum Arbitrarily Reject Warner's Evidence of Disability?

A review of the medical records in this case quickly reveals that Warner's fibromyalgia, chronic fatigue syndrome, osteoarthritis (and chronic low back pain, to the extent that it is a separate diagnosis) are the diagnoses consistently referred to in her medical records and cited as the basis for many of her symptoms, most notably chronic pain. Other diagnoses or potential diagnoses that pepper the medical records range from ultimately unsubstantiated impairments—*e.g.*, lupus—or substantiated conditions that are unlikely to be the source of enduring disability—*e.g.*, sleep apnea, the respiratory infection, the seizure disorder (which is apparently controllable with medication and not debilitating), or the appendicitis. As to the latter group, the Court agrees with Unum that medical evidence of disability is lacking; indeed, Warner herself does not cite these conditions as disabling. For that reason, Unum's discussion of Warner's many non-disabling conditions in its denials of benefits and in this case is something of a digression.

On the other hand, there is ample evidence in the records of the examining physicians, and not contradicted by the Unum doctors' assessments, from which to conclude that Warner suffered (at least) from fibromyalgia, chronic back pain, and chronic fatigue syndrome, on a long-term basis. Unum does not meaningfully dispute that Warner suffered from these impairments, and it would be difficult to contradict the medical records in that regard. The references to osteoarthritis, on the other hand, do not appear to be adequately supported by the available medical evidence, but discounting that diagnosis does not change the focus of the inquiry in this case because the other conditions not challenged could produce similar pain symptoms. The question presented here, therefore, is whether Unum's conclusion that Warner was not disabled, within the meaning of the policy, as a result of these conditions was adequately supported with a reasonable explanation. The Court concludes that it was not.

Unum denied Warner's benefits under the "regular occupation" standard that applies for the first 24 months of disability, and the administrative record is from the appeal of that decision.[3] The 24-month regular occupation period includes the initial 90-day elimination period. Unum concluded that Warner failed to establish that she was unable because of disability to perform her regular occupation, which it characterized as light-duty work, primarily because her complaints of pain and her professed degree of limitation were not substantiated by objective medical documentation or not consistent with fibromyalgia. On the record before it, the Court concludes that Unum's denial cannot be sustained because it improperly disregarded the FCE that Warner submitted in support of her appeal and insisted on objective documentation of symptoms for which no objective tests exist.

As already noted, there is no basis on which to conclude (and Unum does not attempt to establish) that Warner was not actually affected by fibromyalgia, back pain, and chronic fatigue syndrome. The only question is whether these conditions rendered her unable to perform the duties of her regular occupation. As the Seventh Circuit has observed, there are no objective tests that document conditions such as fibromyalgia and chronic fatigue syndrome; they are diagnosed based upon the patient's subjective description of the symptoms. *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007); *Hawkins v. First Union Corp. Long–Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003). But these conditions cannot be disregarded simply because they do not lend themselves to objective testing. *Holmstrom*, 615 F.3d at 769 ("[W]e have rejected as arbitrary an administrator's requirement that a claimant prove her condition with objective data where no definitive objective test exists for the condition or its severity."); *Hawkins*, 326 F.3d at 919;

---

[3] There is no record before the court with respect to the permanent disability standard, which would require Warner to prove her inability to perform "*any* gainful employment."

That is why, in this case, the functional capacity examination is important evidence: although it cannot measure the amount of fatigue or pain an individual experiences, it can assess how much an individual's degree of pain or fatigue limits her functional capabilities, which is something than can be objectively measured. *Williams v. Aetna Life Ins. Co*., 509 F.3d 317, 322-23 (7th Cir. 2007) (faulting claimant with chronic fatigue syndrome for failing to submit "an actual FCE or any measurement of specific limitations" so as to support the claimed level of functional impairment); *Majeski v. Metro Life Ins. Co*., 590 F.3d 478, 485 (7th Cir. 2009) (explaining that a plan may not deny benefits solely on the basis that the symptoms of the claimed disability are subjective, but it may deny benefits where the claimant fails to properly document pain-induced functional limitations). The Seventh Circuit "finds utility in functional capacity evaluations when the testing factors reports of pain into the functional assessment." *Marantz v. Permanente Medical Group, Inc. Long Term Disability Plan*, 687 F.3d 320, 332 (7th Cir. 2012). In this case, the FCE does factor in Warner's reports of pain (and Unum does not argue otherwise). Therefore, the administrator was required to explain why it rejected the FCE. *See Holmstrom*, 615 F.3d at 771 (7th Cir. 2010). And its explanation, even under the arbitrary and capricious standard, cannot "lack substance" or reflect "arbitrary action." *Id*.

The day-long Work Well functional capacity exam that Warner underwent on December 1, 2011, was a lengthy and comprehensive battery of physical tests. *See* Admin. Rec. Vol. II, Dkt. # 103-4, at 1552-1577. Ultimately the FCE concluded that Warner's regular occupation was more strenuous than she could perform, recommending that she could return to work with "job modifications" or "alternative placement." *Id*. at 1553. The FCE report shows limitations on crouching, kneeling, lifting and carrying, and prolonged sitting and standing, and noted that "[o]jective signs coincided with the client's reports of discomfort." *Id*. Particularly noteworthy is

the fact that the therapist who administered the FCE expressly addressed the legitimacy of Warner's effort in performing the various tests required, and concluded that she was not exaggerating or malingering, finding that the functional limitations noted in report were consistent with the diagnoses of low back pain, osteoarthritis, and fibromyalgia and that the objective evidence observed during the tests was consistent with Warner's self-reported perceptions of pain.

Despite the clear importance of an FCE when a claimant suffers from fibromyalgia, chronic fatigue, or related conditions, Unum, in its denial letter, provided only a terse explanation that is plainly inadequate in the context of Warner's claimed disability. Unum addressed none of the specifics of the FCE report, stating only that it had "noted and evaluated" the FCE findings, but went on to state "there are no exams, laboratory testing, specialty evaluation, medication changes or imaging to support the level of impairment Ms. Warner describes." Of course there are not—the very reason an FCE was necessary was to objectively document the *limitations* caused by conditions that cannot themselves be substantiated with imaging and laboratory testing. S*ee Holmstrom*, 615 F.3d at 769-70. In light of the FCE, Unum's bald statement, unsupported by any medical authority, that "[t]he level of severity Ms. Warner describes is in excess of fibromyalgia symptoms and no restrictions or limitations are supported," was arbitrary and capricious. The FCE substantiates a level of impairment sufficient to satisfy the policy definition of "disabled" (Unum does not argue to the contrary) and, at the very least, Unum was obligated to explain why the FCE did not establish an inability to perform the job that its occupational consultant had deemed a "light" work position.

In its summary judgment briefing, Unum argues that the FCE documents only impairments caused by the injury to Warner's back in November 2011 during physical therapy.

Mem., Dkt. # 130 at 6. But nothing in the FCE itself supports this conclusion; although at the time of the exam, Warner's chief complaint was "back pain," there is nothing to support Unum's current argument that all of Warner's symptoms "related to the lower back injury" rather than her long-documented chronic back pain and fibromyalgia. This is an unconvincing post-hoc rationalization for rejecting the FCE rather than the "substantive" explanation for rejecting it in the first instance that is required by Seventh Circuit precedent; certainly Unum's reviewing physician did not reject the FCE on that basis. To the contrary, she simply ignored it. Dr. Rodela, on whose opinion Unum relied in the administrative appeal, barely mentioned the FCE, simply noting a couple of the lifting and mobility restrictions set forth in the report without comment— which explains why Unum's letter denying Warner's appeal includes no substantive discussion of the report.

In any case, Unum's focus on diagnosis—*i.e.*, its insistence that FCE evaluated only limitations caused by the November back injury—largely misses the point. The relevance of the FCE is not to show that the limitations reported on the FCE could be isolated to any particular cause; the test measures capabilities, not pathologies. Indeed, it is doubtful that the physical therapist who administered the testing was qualified to opine on the medical cause of the limitations. The purpose of the FCE was not to determine whether Warner's limitations were the product of osteoarthritis[4] in combination with fibromyalgia but rather to assess and document the degree of impairment—whatever its cause(s).

---

[4] Unum also disputes that Warner's osteoarthritis diagnosis (by Dr. Sureka), which is referred to in the FCE, is supported. *See* Mem., Dkt. # 125 at 7. As the Court has noted already, the FCE is not a diagnostic tool and is not performed by a physician, so the extent it listed a prior diagnosis, the reliability of the FCE's results is not called into question. And Unum does not explain why osteoarthritis could not have contributed to, or exacerbated the severity of Warner's pain and functional limitations, even if standing alone it was unlikely to have been sufficiently severe to account for them. Furthermore, even if Unum is correct that osteoarthritis was not

Whether or not osteoarthritis was contributing to Warner's pain,[5] the FCE documents functional limitations consistent with the policy definition of disabled, Unum's own vocational consultant, Marian Pearman described the requirements of Warner's regular occupation as a "Nurse Supervisor Occupational Health Nursing," concluding that this "light" work in the national economy occasionally requires lifting, carrying, pushing, and pulling 20 pounds and frequently 10 pounds, as well as "walking and or standing frequently even though weight is negligible"; the job also "can include pushing and or pulling of arm and or leg controls." There is no evidence that Unum compared this description of the physical demands of Warner's job with her capabilities and limitations as recorded in the FCE.

In denying Warner's appeal, Unum did not question the FCE methodology, the qualifications of the physical therapist who administering the testing, or any aspect of the examination. Nor did Unum assert, much less establish a basis to infer, that Warner was malingering or otherwise attempting to manipulate the results of the FCE—which would be a tall order in light of Bryan's express observations to the contrary. Rather, Unum's rationale for dismissing the FCE, as evident from Dr. Rodela's assessment, was that the FCE recorded functional limitations caused by impairments that could not be seen or measured with objective medical tests. Thus, despite the presence of an FCE at least arguably showing disability under the regular-occupation standard, Unum's grounds for denial come down to the absence of objective medical testing to support her subjective symptoms—even though the resulting limitations were documented. *Hawkins*, *Holmstrom*, and other Seventh Circuit precedent all

properly diagnosed, it is not the basis of her disability claim, and there is sufficient evidence of her other chronic pain conditions and the functional limitations caused by her pain.

forbid the denial of benefits based on this sole ground if indeed there are no applicable objective medical tests to perform.

The Court is not, as Unum suggests of Warner, "anoint[ing] FCEs as the determinative litmus test for disability" or advocating that an FCE is "the decisive test that outweighs all other evidence." Mem., Dkt. # 130 at 5. But the Seventh Circuit has explained that "procedural reasonableness is the cornerstone of the arbitrary-and-capricious inquiry," *Majeski*, 590 F.3d at 484, and the precedent requiring a proper FCE to be taken into account, and to be addressed with a substantive explanation of its purported shortcomings, is clear: "[A] plan administrator's procedures are not reasonable if its determination ignores, without explanation, substantial evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue-here, whether [the claimant's] functional limitations were objectively documented." *Id.* As noted, the arbitrary and capricious standard does not allow the Court to rubber-stamp the administrator's rejection of a disability claim; the Seventh Circuit has not hesitated to enforce the administrator's obligation to provide reasoned decisions. *E.g., Holmstrom*, 615 F.3d at 772; *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 835 (7th Cir. 2009); *Love v. National City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397-98 (7th Cir. 2009). Unum disregarded clear precedent at its peril, and as a result, its failure to explain the rejection of the FCE, and its insistence on objective documentation, must be deemed to have been arbitrary and capricious.

**B.      Did a Conflict of Interest Influence Unum's Denial of Benefits?**

The foregoing conclusion alone suffices to require the granting of Warner's motion for summary judgment. But Warner's argument regarding Unum's conflicts of interest and

purported history of bias merits some discussion.[6] Warner argues that the structural conflict of interest inherent in the same entity both evaluating disability and determining whether to pay benefits, is entitled to greater weight in this case because it is exacerbated by the "intense pressure" on Unum's in-house physicians to review files quickly and by a history of biased claims administration on the part of Unum.

Warner's argument fails because she does not establish that the insurer's structural conflict of interest likely influenced its decision. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). In *Glenn*, the Supreme Court clarified that conflicts of interest are "a factor" for courts to consider, and set forth a sliding scale concerning how heavily the factor should weigh: "The conflict of interest at issue . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking

---

[6] On the other hand, the Court does not find it necessary to separately address whether Unum's decision is arbitrary because it favored the consulting physician's assessments over the records of doctors who actually examined and treated Warner. The Supreme Court has been clear that, with respect to benefits under and ERISA plan, there is no presumption of deference to the treating physician. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). Even so, "[a]dminstrators may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician." *Holmstrom*, 615 F.3d at 774-75. Given the Plan's obligation to consider all reliable evidence (including an FCE where available), and to account for the unlikelihood of producing objective evidence of the symptoms of conditions such as fibromyalgia, there is no need to separately parse whether the Plan gave due weight to the treating physician compared to its non-examining medical consultants.

irrespective of whom the inaccuracy benefits." *Id*. at 117. Warner suggests that the "high likelihood" of influence is present in this case because of the timeline imposed by Unum on its in-house physicians and the history of bias in Unum's adjudication of claims.

But Warner has not adequately substantiated either of these reasons to infer that Unum's evaluation of her claims was compromised by conflict of interest. With respect to the deadlines Unum imposes on in-house reviewers, Warner submits evidence that Unum's claims reviewers must act swiftly and further that their bonus compensation is affected by their rate of review.[7] The physicians must review files at a rate of six to 12 per week and spend a maximum of five days on any file. The doctors' bonus compensation, which is up to 25% of their total compensation, is tied to the speed with which they review files. From this, Warner infers that the doctors must be sacrificing accuracy for expediency.

But she does not submit any evidence from which it can be inferred that the compressed timeframe results in improper *denials* of benefits or that compensation rises or falls based on the doctors' conclusions, rather than the pace at which conclusions are reached. In other words, Warner is merely speculating that Unum's policies regarding the timeline for file review and its

---

[7] The parties (presumably at Unum's behest) have treated this information as confidential and sought and obtained leave to file the unredacted versions of their briefs under seal on this basis. *See* Dkt. ## 129, 110, 80. On further review of these materials, however, this information is relevant to the Court's analysis and decision and is therefore included in this opinion. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Hicklin Engineering, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006) ("Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat and requires rigorous justification."); *Baxter Int'l., Inc. v. Abbott Laboratories*, 297 F.3d 544, 545 (7th Cir. 2002) ("Secrecy is fine at the discovery stage, before the material enters the judicial record. . . . But those documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality.").

compensation structure influence outcomes by increasing denials.[8] This speculation does not entitle the structural conflict of interest any more weight than it ordinarily carries as "a" factor to weigh. Moreover, Dr. Rodela, who was Unum's reviewing physician on Warner's appeal, is not even eligible for a Unum bonus as an independent contractor.

The alleged history of bias that Warner invokes consists of prior cases in which Unum was held to have improperly denied benefits. In particular, Warner cites *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) for the following statement: "*Glenn* cited Unum as the textbook example of an insurer with a history of bias claims administration." Mem, Dkt. # 114 at 13. That is an overstatement, to say the least; that statement does not appear on page 117 or anywhere else in the *Glenn* decision. Instead, there is a citation to a law review article that, in turn, is critical of Unum's claims administration practices at one point in time; the citation is by way of example, and the Court's opinion certainly makes no finding that the history set forth in the article is reliable or conclusive. And even assuming that it is, the article pertains to Unum's claims administration practices prior to 2003 and Warner does nothing to establish the relevance of that article to the denial of her 2011 claim. The only other reference to Unum in *Glenn* is in Chief Justice Roberts' concurrence (joined by no other Justice) explaining his view of the proper consideration of insurers' conflicts of interest, explaining that they should be used as grounds a finding that an administrator abused its discretion "only where the evidence demonstrates that the conflict *actually motivated or influenced* the claims decision." *Id*. at 123 (emphasis added). This could be evidence "that appear[s] on the face of the plan," "evidence of other improper incentives," or evidence of "a pattern or practice of unreasonably denying meritorious claims." As to this last circumstance, the Chief Justice cited *Radford Trust v. First Unum Life Ins. Co. of*

---

[8] Indeed, Warner supplies no reason why the increased error rate that she assumes would not also result in the improper granting of claims for benefits.

*Am.*, 321 F. Supp. 2d 226, 247 (D. Mass. 2004), in which the district court referred to a "pattern of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics" by First Unum and Unum Life Insurance Company of America (the defendant here) in order to boost profits. But Warner has not linked the facts underlying the bias explained in *Radford Trust*—a decade-old decision—to her own claim.

To the extent that Warner wishes to rely on any purported "pattern or practice," therefore, she falls short. A showing of biased decision-making, if substantiated, is indeed relevant under *Glenn*, but Warner has done nothing to establish a relevant history of bias for purposes of summary judgment. She offers no evidence that any of the problems alleged to have afflicted Unum's practices more than a decade ago persist, and no rebuttal to evidence Unum offers that Unum has long since implemented substantial reforms.

Although the Court does not believe that the inherent structural conflict of interest reaches "the vanishing level" of importance under *Glenn*—as far as the record shows Unum has not taken active steps to mitigate it—neither has Warner shown that increased weight should be given to the conflict due to a history of bias or the bonus compensation issue. The Court nevertheless concludes that Warner's motion must be granted because Unum abused its discretion in denying her claim without substantively explaining its rejection of her FCE and relying exclusively on the absence of objective tests confirming her subjective symptoms.

## C.    Remedy

"Generally, when a court or agency fails to make adequate findings or fails to provide an adequate reasoning, the proper remedy in an ERISA case, as well as a conventional case, is to remand for further findings or explanations, unless it is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Tate*, 545 F.3d at

563 (internal quotations omitted). In lieu of a remand, Warner asks the Court to reverse the insurer's determination and award benefits based on the evidence in the record. Unum offered no response to Warner's argument on this point.

The Court agrees with Warner that this case presents the unusual situation in which remand is not appropriate. As noted, under the Plan, the definition of "disabled" changes after 24 months; this case involves only Unum's determination that Warner was not disabled under the definition applicable to the initial two-year period. That period has long since elapsed and the record on which that determination can be based is effectively closed. No new evidence pertaining to Warner's condition during that period can be developed now; further examinations of Warner will not yield evidence pertaining to her condition during that initial two-year period. The determination of whether Warner was disabled during that period can only be based upon examination and treatment records created during that period, including the FCE report. As discussed, the FCE reliably documents Warner's physical limitations during that period, yet Unum ignored it. It would be both unfair and uneconomical to require a remand so that Unum could have a second bite at the apple and re-interpret the same evidentiary record when it unreasonably ignored substantial relevant evidence on the first go-round. *Cf. Dabertin v. HCR Manor Care, Inc.,* 373 F.3d 822, 832 (7th Cir. 2004) (affirming district court's decision not to remand decision to plan administrator for further consideration as unfair and inefficient). To remand this decision to Unum would, moreover, undermine Unum's incentives to address such evidence in the first instance by effectively making its claim review an iterative process without risk of penalty. Unum had ample opportunity to explain its rationale for denying Warner's claim. That rationale was inadequate, so judgment in Warner's favor is appropriate.

By contrast, as to whether Warner is unable to perform *any* gainful employment, so as to render her totally disabled under the Plan, there is no administrative determination for the Court to review under that standard. Accordingly, any findings as to her disabled status after 24 months, under the no-gainful-employment standard, are for the administrative process in the first instance.

Finally, Warner's request to amend her complaint and add a claim for the equitable disgorgement of profits is denied. Although the Court is skeptical that such a remedy is available on top of that provided by section 502(a)(1)(B) of ERISA,[9] the threshold problem is that Warner buried her request for leave to amend in her summary judgment brief (at 15) and did not develop it. A complaint cannot be amended in the summary-judgment briefs; a motion under Fed. R. Civ. P. 15 is required. *See Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002).

\* \* \*

For the foregoing reasons, Warner's motion for summary judgment is granted, and Unum's is denied. Judgment will be entered for the plaintiff as to her claim that Unum abused its discretion in denying the long-term disability and life insurance benefits for the first 24 months after the onset of her disability.

Date: December 31, 2014

John J. Tharp, Jr.
United States District Judge

---

[9] Warner bases her request on the since-vacated decision of the Sixth Circuit in *Rochow v. Life Ins. Co. of Am.*, 737 F.3d 415 (6th Cir. 2013), *rehearing on banc granted and opinion vacated*, Order, No. 12-2074 (6th Cir. Feb. 19, 2014).